Christopher J. Raleigh, Esq.
Nevada Bar No. 1596
**RALEIGH, HUNT & MCGARRY, P.C.**
112 Garces Avenue, Second Floor
Las Vegas, Nevada 89101-6616
ph. (702) 386-4842; fax (702) 386-5990

Shawn B. Meador, Esq.
Nevada Bar No. 338
**WOODBURN AND WEDGE**
6100 Neil Road, Suite 500
Post Office Box 2311
Reno, Nevada 89505
ph. (775) 688-3000; fax (775) 688-3088

Attorneys for Defendant

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
### RENO, NEVADA

| | |
|---|---|
| DENNIS WAYNE LIBRO, | ) |
| Plaintiff, | ) |
| vs. | ) Case No.: **CV-N-00-0603-ECR (RAM)** |
| UNION PACIFIC RAILROAD COMPANY, | ) |
| Defendant. | ) |

## DEFENDANT'S MOTION TO DISMISS
## PLAINTIFF'S SECOND CAUSE OF ACTION

Defendant, Union Pacific Railroad Company (hereinafter "Defendant" or "UPRR"), by and through its attorney, Christopher J. Raleigh, Esq. of the law firm RALEIGH, HUNT & MCGARRY, P.C., hereby moves this Honorable Court, for an order dismissing Plaintiff, Dennis Wayne Libro's ("Libro" or "Plaintiff") Federal Safety Appliance Act, 49 U.S.C. § 203011, *et seq.* which is alleged as his Second Cause of Action as contained in his *First Amended*

*Complaint for Damages.* This motion is made and based upon the pleadings and papers on file herein, the following points and authorities, and the argument of counsel at any hearing of this matter.

Respectfully submitted this 22nd day of August, 2003.

RALEIGH, HUNT & McGARRY, P.C.

Christopher J. Raleigh, Esq.
Nevada Bar No. 1596
112 Garces Avenue, Second Floor
Las Vegas, Nevada 89101-6616
ph. 702-386-4842; fax 702-386-5990
Attorneys for Defendant

## POINTS & AUTHORITIES

### I.
### GENERAL FACTUAL BACKGROUND

As noted in the parties' earlier pleading and papers, this lawsuit involves an incident occurring on the morning of January 4, 1998, when the train on which Plaintiff, Dennis Wayne Libro ("Plaintiff" or "Libro"), was working went into "emergency" and came to a stop a few miles west of the Elko yard. See Libro's deposition transcript, at 10-11. Libro suffered no injury as a result of the "emergency" nature of the train's stop. After the train had come to safe stop without incident, Plaintiff climbed down off the train to inspect it in the hopes of learning the reason for the emergency stop.

After safely climbing down from the train, Libro walked along the train as it sat idly on the tracks. Libro subsequently located a car on which a bracket had broken. Apparently, this broken bracket caused an air brake hose line to become uncoupled. This uncoupling apparently

lead to a loss of air whereby resulting in the train coming to an emergency. Id. at 13.

After observing the bracket and uncoupled (but operational) air line, Libro apparently used a bungee cord or something of that sort to support the air brake hose line in such a manner that it would remain coupled, thus restoring and maintaining air pressure to the brake lines. Id., at p.17. After securing the air line, the train crew then began to operate the train again.

After making several train movements, the railroad car with the broken bracket was placed in such a position to allow it to be put onto a "run-around" track. Id. at 17-19. After all of the several train movements had been accomplished without incident and train had once again come to a safe stop, Libro again safely climbed down off the train. After safely disembarking the train, Libro then walked a short distance to the "switch" which would have to be "thrown" or "lined" to allow the crew to back the car with the broken bracket from the main track onto the run-around track. After walking along the path that parallels the track, he reached the switch. Id. at 19-21.

After reaching the switch without incident, Libro then contends he attempted to "throw" or "line" the switch. After the lever allegedly moved about one quarter of the distance, it came to a halt. Id., at 23. After the switch came to a halt, Libro then states it was then that he noticed a spike sitting loosely in the spike hole. Id. at 24.

Libro acknowledged he could easily see the spike at that point. Id. Libro also acknowledged he was able to simply lift the spike out of the hole with his hand without the need of any tool, as it was allegedly sitting loosely in the spike hole. According to Libro, the spike apparently came between the two points of the tracks, preventing them from coming together and causing the lever movement to stop.

This switch was not out of service. It is undisputed that when a switch is taken out of service the appropriate course of conduct is: 1) to place a tag on the switch to give others notice that the switch is out of service; 2) physically lock the switch with a heavy pad lock to prevent anyone from trying to throw or line it; and 3) *drive* a spike into the spike hole as a final precaution.

Here, the switch was not out of service. None of the just referenced normal indications were present to indicate the switch was out of service. The switch was not tagged, padlocked, or had a spike driven into its spike hole. Libro concedes he lacks any evidence the switch was out of service or even intended to be taken out of service Id., at 28-29. In fact, the switch was inspected only days before Libro's event and found to be fine. Instead, all there is here is an unwitnessed incident in which Libro's claims the switch came to an earlier stop because of an alleged loose spike. There are no witnesses to this and no one can collaborate Libro's contention the spike was actually in the switch as claimed.

Still further, Libro, a twenty (20) year railroader, acknowledges and admits he knew and understood on January 4, 1998, that UPRR's Safety Rules require him to carefully inspect a switch prior to attempting to align it so as to make sure there is nothing to prevent its proper operation. Id., at.21. It is undisputed that - for what ever reason - Libro failed to accurately determine if there was anything that would prevent the switch from operating properly before attempting to align it.

Twelve (12) days after the incident, Libro gave a recorded statement wherein he stated the following about his throwing the switch:

I stopped the movement. Got off the car, **glanced at the switch**, I didn't see

**Page 4 of 14**

anything out of the ordinary. I stooped down to line the switch.

See, Libro's statement, pg. 2 (emphasis added). At his deposition on September 14, 2001, Libro testified he made every effort to be as accurate as possible when he gave his January 1998 recorded statement. Id., at 35.

Yet, at his deposition taken September 14, 2001, approximately three (3) years and nine (8) months after the January 1998 incident, Libro claimed he inspected the switch carefully but that he did not see the loose spike. See depo., at 21-22, 31, 32. Libro cannot explain his failure to see the spike even in light of his now claimed careful inspection. Id. at 32.

Libro testified he does not believe that the accident was caused by anything other than the spike somehow being in the switch. Id., at 28-29. Similarly, he does not believe any mechanical or procedural problem led to the incident. Id. The only alleged unsafe equipment he believes contributed to the accident was the spike allegedly sitting loosely in the switch. Id., at 27-28.

Libro admits he does not know how the spike came to be loosely sitting in the switch. Id., at 25. Libro also is unaware of anyone with knowledge of how the spike allegedly came to be in the switch. Id., at 25-26. Still further, Libro is unaware of any document reflecting how or when the spike happened to get into the switch. Id. at 40-41.

Instead, all Libro can proffer is speculation that perhaps, possibly, or maybe other railroad employees, children playing in the area, or vandals placed the spike in the switch. Libro, however, lacks any evidence to support these speculative possibilities. They are pure and simple speculation and conjecture. Id. at 26-27.

Libro also has no evidence UPRR knew or should have known of this spike prior to the

incident. Libro likewise has no evidence UPRR's weekly inspection schedule is unreasonable or inappropriate, especially in light of the fact (admitted by Libro himself) he is supposed to inspect switches prior to lining/throwing them.

## II.
## ARGUMENT

### 1. Authority.

In an action under the Federal Employers' Liability Act ("FELA"), commencement of the action within the statute of limitations is a condition precedent to recovery rather than an affirmative defense. Billman v. Missouri Pacific R. Co., 825 S.W.2d 525 (Tex. App. - Ft. Worth 1992), writ denied. A defendant is entitled to the benefit of the limitation fixed by 45 U.S.C. § 56 without pleading it. Peterson v. Union Pac. Co., 8 P.2d 627 (Utah 1932).

Plaintiff in a FELA action has the burden to prove the action was commenced within the three-year limitations period. See Wilson v. Zapata Off-Shore Co., 939 F.260 (5th Cir. 1991); Monaghan v. Union Pacific R. Co., 496 N.W.2d 895 (Neb. 1993). The limitation period of the FELA is not a procedural matter relating to remedy, but is a condition of liability constituting a substantial part of the right created. Huett v. Illinois Cent. Gulf R. Co., 644 N.E.2d 474 (Ill.App. 1994), appeal denied, 649 N.E.2d 416.

### 2. Libro's SAA claim should be dismissed because it was not commenced within the three (3) year limitations period.

Libro alleges he suffered injuries on January 4, 1998. See Libro's *Complaint for Damages*, ¶ V. Libro's *Complaint for Damages* was filed November 17, 2000. As already

Case 3:00-cv-00603-ECR-RAM   Document 52-2662602   Filed 08/25/03   Page 7 of 15

recognized by the Court, "[t]he allegations in the Complaint are consistent with a personal injury claim arising under the FELA." See Order filed January 23, 2002.

On October 23, 2001, Libro filed *Plaintiff's Motion to File First Amended Complaint and Memorandum of Points and Authorities Pursuant to FRCP § 15(a)* (docket no. 14), seeking permission to set forth a claim under the Federal Safety Appliance Act, 49 U.S.C. § 20301, *et seq.* ("SAA"). Libro's request was granted pursuant to the Order filed January 23, 2002.

Subsequently, on or about January 31, 2002, Libro filed his *First Amended Complaint for Damages* alleging an SAA claim as the Second Claim for Relief relative to the January 4, 1998, alleged injuries. Id., at ¶¶ IX-XI.

Neither Libro's October 23, 2001, request to amend his pleading to assert a SAA claim nor the January 31, 2002, filing of his Amended Complaint containing a SAA claim were made or commenced within three (3) years of his January 4, 1998, alleged injuries. See 45 U.S.C. § 56; see also Fed.R.Civ.P. 12(h)(3).[1] As a consequence, Plaintiff's SAA claim must be dismissed.

### 3. The FELA claim and the SAA claim involve different conduct, occurrences, proof, types of law (negligence as opposed to strict liability), occurred at different times and under different circumstances.

Here, while Libro's SAA claim must be brought under the general ambit of the FELA, they differ widely. Unlike Libro's FELA claim, the SAA claim is akin to strict liability in that the injured employee need not prove fault in order to recover. In addition, the facts and

---

[1] Fed.R.Civ.P. 12(h)(3) provides: Whenever it appears by suggestion of the parties or otherwise the court lacks jurisdiction of the subject matter, the court shall dismiss the action.

circumstances underlying the two (2) claims are also distinct, despite the fact they both occurred on January 4, 1998.

The FELA claim, as originally alleged by Libro, involves allegations UPRR "negligently ... caused to be placed, a spike in a track switch plaintiff was required to throw, without warning thereof...." See *Complaint for Damages*, at ¶ V. The *Complaint for Damages* does not allege any SAA claim or even reference there was an alleged safety appliance defect. In fact, the Complaint is devoid of any such reference. The entire focus of the *Complaint for Damages* was on the switch and the spike allegedly left therein.

As referenced above, after the train had come to a safe stop and without incident, Plaintiff climbed down off the train to inspect it with the hope of learning the reason for the emergency stop. After safely climbing down from the train, Libro walked along the train as it sat idly on the tracks. Libro subsequently located a car on which a bracket had broken. At his deposition, Libro testified that "evidently the pressure from the dynamic [emergency] stop pushed back and broke it off and it was dragging down and caused the air hose itself to uncouple at the coupler." Id., 13:11-14. Regarding the bracket and it becoming broken, Libro further testified:

Q. And it [the bracket] had broken?

A. Yeah, it was broken completely off. It was a good size chunk of metal.

Q. Do you know how it had come to be broken?

A. No.

Q. Do you know when it broke?

A. **I would have to say it broke when we went into dynamic and the train**

> **bunched up. The forces of the train, you know, pushed it together and caused it to break off.**

Id., 14:2-11 (bold emphasis added). The facts and circumstances surrounding the bracket involve separate conduct and occurrences than do the facts and circumstances of the later incident involving the switch. In addition, from this testimony, it appears Libro believed the broken bracket occurred *after* the train underwent emergency stop, not because of it.

Yet still, it was after observing the bracket and uncoupled (but operational) air line, Libro apparently used a bungee cord or something of that sort to support the air brake hose line in such a manner that it would remain coupled, thus restoring and maintaining air pressure to the brake lines. After securing the air line, the train crew then began to operate the train again.

After making several train movements, the railroad car with the broken bracket was placed in such a position to allow it to be put onto a "run-around" track. After all of the several train movements had been accomplished without incident and the train had once again come to a safe stop, Libro again safely climbed down off the train. After safely disembarking the train, Libro then walked a short distance (an approximate car length) to the "switch" which would have to be "thrown" or "lined" to allow the crew to back the car with the broken bracket from the industry track onto the run-around track. After walking along the path that parallels the track, he reached the switch.

From the foregoing, it is clear the SAA claim does not involve the switch. Instead, it allegedly involves one of the railroad cars and an apparent air line bracket which apparently broke *after* the train came to an emergency stop. The facts and circumstances involving the SAA claim happened at a different time and different location when compared with the FELA

claim and its allegations concerning the switch. Even setting aside the fact the FELA claim and SAA claim involve different instrumentalities, different proofs, different legal theories (one sounds in negligence and the other in strict liability), the actual events surrounding the respective claims occurred separately.

### 4. UPRR did not become aware of Libro's SAA claim until after the statute of limitations ran.

Statutory limitation periods are "'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'" American Pipe and Construction Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974) (quoting Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944)). The theory is that even if the plaintiff has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation. Id.

Here, Libro's Report of Personal Injury or Illness completed January 5, 1998, the day after the incident provides his contention as to what caused or contributed to his injury:

(10) HOW DID ACCIDENT/INCIDENT OCCUR? *While tryin to line switch to trk. # 471 west of elko yard to s/o bo/car.*

(11) WHAT SPECIFICALLY CASE THE ACCIDENT/INCIDENT: *Spike in switch plate next to switch points.*

(12) DID EQUIPMENT, TOOLS CAUSE OR CONTRIBUTE TO THE CASE OF THE ACCIDENT? $X$ YES __ NO IF YES, PROVIDE COMPLETE DETAILS (including equipment ID number) *Switch leading into yd 23 trk. 471 west end had spike set loosely in hole on switch plate next to switch points.*

(13) DID WORKING CONDITIONS CAUSE OR CONTRIBUTE TO THE CAUSE OF THE ACCIDENT?  _X_ YES  __ NO   IF YES, PROVIDE COMPLETE DETAILS *Spike was left in switch allowing it to be lined 1/4 of the way. It then caused switch handle to stop abruptly.*

(14) DID OTHER PERSONS CAUSE OR CONTRIBUTE TO THE CAUSE OF THE ACCIDENT?  _X_ YES  ____ NO   IF YES, PROVIDE COMPLETE DETAILS *Someone left spike in switch, no out of service tag or lock on switch*

Id., Section II, ¶¶ 10-14 (emphasis added). At his September 14, 2001, deposition Libro testified the Report of Personal Injury or Illness was accurate. Id., 34:3-6.

Libro also testified at deposition as follows regarding the cause of the accident:

Q. Do you claim the accident was caused by any unsafe tool or tools?

A. No.

Q. **Do you claim the accident was caused by any unsafe equipment?**

A. **The switch.**

Q. And was there anything unsafe about the switch other than there was a spike in the hole?

A. No, not that I could see.

Q. Do you claim that your accident was caused by any unsafe work procedures?

A. Yes.

Q. And what's that?

A. That if a switch is to be spiked, according to the rules, it's supposed to be tagged and locked with a Maintenance or Way lock which the train man or anyone operating a train does not have a key to, and it's also supposed to be in your track warrant or track bulletins for that trip or forever how long, you know, it's going to be out of service and it's supposed to be - - I believe they're supposed to let you know when it is back in service and I believe it's a permanent condition. I'm not sure on this, if it's supposed

Page 11 of 14

1         to be in your general orders, too.

2 Q.   Well, that's all assuming that this switch was intended to be spiked, correct?

3 A.   Right.

4 Q.   Do you have any reason to believe that this switch was intended to be spiked?

5 A.   No.

6 Q.   Any other unsafe work procedure?

7 A.   None other than if that switch was supposed to be inspected, that it wasn't or - -

8 Q.   But you don't know whether it was inspected or when it was inspected, is that correct?

9 A.   No, I have no idea.

10 Q.   **Okay. In your opinion, was the accident caused by anything other than the fact that there was a spike somehow in the switch hole?**

11 A.   **No, I believe I did everything properly.**

12 Q.   **Are there any other mechanical or procedural problems that you're aware of that led to your accident?**

13 A.   **None other than it should have been that it was spiked and it should have been tagged and locked and I should have had forewarning of it in the track warrants.**

14 Q.   Well, again, that assumes that it was intended to be spiked, correct?

15 A.   Right.

16 Q.   And you're not aware of any facts that lead you to believe that it was supposed to be spiked?

17 A.   No.

Id., to 27:22 to 29:22 (bold emphasis added).

The foregoing evidence clearly demonstrates Libro attributed the cause of his alleged injuries to the switch. Similarly, Libro's *Complaint for Damages* filed thirty-four (34) months later on November 20, 2000, alleges only the switch as the cause of any injuries (UPRR "negligently ... caused to be placed, a spike in a track switch plaintiff was required to throw, without warning thereof...." See *Complaint for Damages*, at ¶ V.).[2]

Then, ten (10) months after the filing of the action (and forty-two (42) months after the incident), Libro yet again confirmed at his September 14, 2001, deposition the cause of his alleged injuries was the switch. Finally, on October 23, 2001 (forty-three (43) months after the incident), Libro filed his motion seeking permission to set forth a SAA claim. Notwithstanding the Courts' permission he be allowed to amend, Plaintiff's Safety Appliance Act Claim was not filed within the three year statute of limitations.

## III.
## CONCLUSION

The Court has already found Libro's original complaint only brought a claim under the FELA, not a SAA claim. The SAA claim was not commenced within the three (3) year statutorily required time. The SAA claim does not relate to the same conduct or occurrence as the FELA claim and does not relate back to his original filing. UPRR was not on notice of Libro's SAA claim until after the running of the statute of limitation. Therefore, Libro's SAA

---

[2]This Court recognized "[t]he allegations in the Complaint are consistent with a personal injury claim arising under the FELA." See Order filed January 23, 2002.

claim should be dismissed. See 45 U.S.C. § 56; Fed.R.Civ.P. 12(h)(3).

Respectfully submitted this 2nd day of August, 2003.

RALEIGH, HUNT & McGARRY, P.C.

_____
Christopher J. Raleigh, Esq.
Nevada Bar No.1596
112 Garces Avenue, Second Floor
Las Vegas, Nevada 89101-6616
ph. (702) 386-4842; fax (702) 386-5990
Attorneys for Defendant

## CERTIFICATE OF MAILING

**I HEREBY CERTIFY** that on the 25 day of Aug, 2003, I served a true copy of the above and foregoing **DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S SECOND CAUSE OF ACTION** by causing same to be deposited in the United States Mail, at Las Vegas, Nevada, in a sealed envelope, first class postage thereon fully prepaid, addressed as follows:

| | |
|---|---|
| Anthony S. Petru, Esq.<br>Hildebrand, McLeod & Nelson, Inc.<br>Westlake Building<br>350 Frank H. Ogawa Plaza, Fourth Floor<br>Oakland, California 94612-2006 | J.D. Sullivan, Esq.<br>Sullivan Law Offices<br>1650 North Lucerne Street, Suite 201<br>Minden, NV 89423 |
| | Shawn B. Meador, Esq.<br>Woodburn and Wedge<br>6100 Neil Road, Suite 500<br>Post Office Box 2311<br>Reno, Nevada 89505 |

_____
Employee of RALEIGH, HUNT & McGARRY, P.C.